## Exhibit SSDI-CONDUCT

## Lincoln's Collect-and-Deny Pattern: SSDI Coordination Concurrent with Benefit Denial

### Twelve Cases, Seven Circuits — Including Brown & Brown's AI-Powered Collection Infrastructure

> This exhibit documents Lincoln Financial Group's institutional practice of directing LTD claimants into SSDI applications through funded advocates, securing contractual first liens on the resulting federal awards, and then — in the same claims files — asserting that claimants do not meet Lincoln's own disability standard. The pattern is documented across twelve cases in seven federal circuits. The exhibit also documents the AI-powered product suite Brown & Brown Absence Services Group operates on behalf of carrier clients while simultaneously serving as the claimant's SSA-appointed fiduciary — tools that predict SSDI award probability, overpayment repayment likelihood, and the optimal moment to settle the anticipated ERISA lawsuit. The district court's text-order pattern did not engage any of this. The statutory and historical analysis supporting this exhibit is developed in Exhibit 407-HIST.

> **A Note on Scope and Procedural Posture**
>
> This exhibit presents detail that may not ordinarily be appropriate for an interlocutory appeal. The Fifth Circuit granted Plaintiff a PACER fee exemption — an extraordinary procedural benefit — that enabled docket-level research across seven federal circuits. Plaintiff is grateful for that exemption. The research it made possible revealed a cross-case pattern of strategically timed SSDI award collections concurrent with LTD benefit denials, and subsequently the AI-powered collection and litigation optimization infrastructure Brown & Brown operates while simultaneously serving as Plaintiff's SSA-appointed fiduciary.
>
> Plaintiff is a pro se litigant with no mechanism other than this Court's docket to disclose what that research uncovered. The conduct documented in this exhibit implicates proceedings before the Social Security Administration — a federal agency — and involves AI tools whose existence and function are undisclosed to SSA. Failing to bring this information before the tribunal that granted the fee exemption enabling its discovery would be the wrong choice. Plaintiff presents it here in the most accurate form available on the current record, acknowledges that full development requires discovery in the district court, and asks the Court to consider it for the limited purpose stated in Section 4: as context for the Glenn structural conflict the district court declined to engage, and as a basis for preserving the discovery question on remand.

## SECTION 1 — BROWN & BROWN'S AI-POWERED COLLECTION INFRASTRUCTURE

Brown & Brown Absence Services Group is Lincoln's designated SSDI advocacy vendor in Bruff. Lincoln assembled and delivered a mandatory DocuSign packet to Plaintiff on January 9, 2026 containing the Brown & Brown SSA-1696 appointment form, a certification under penalty of perjury that Brown & Brown will act as Plaintiff's SSA fiduciary, and an Electronic Funds Transfer authorization directing Plaintiff to authorize Brown & Brown to debit Plaintiff's bank account upon any SSDI award and forward the proceeds to Lincoln. (Exhibit Brown1; Lincoln/Bruff 0407–0408.) The sworn fiduciary certification and the bank debit authorization are facially irreconcilable instruments delivered in a single transaction assembled by Lincoln.

Brown & Brown's CEO letter, included by Lincoln in that same mandatory packet, states that Brown & Brown has "assisted over 200,000 claimants in receiving SSDI benefits" across "18 of the top 20 LTD carriers by premium volume." (Source 4.) Lincoln chose those figures and delivered them to Plaintiff as part of the mandatory enrollment terms. Brown & Brown is not a neutral advocacy organization. It is a commercial enterprise whose revenues derive from carrier relationships, not from claimant relationships. Its publicly documented AI product suite makes the structure of those relationships plain.

### 1-A. Claim Compass — Three AI Models Running Continuously on Live Claimant Data

Brown & Brown describes Claim Compass on its public SSDI Advocacy Services page as "a powerful suite of predictive model tools" addressed to carrier clients — "your blocks of business, giving you the insights and confidence to effectively manage long-term risks." The suite contains three models. The first predicts the likelihood and timing of an SSDI award based on the strengths of the disability claim as defined by SSA. The second predicts likelihood to repay an SSDI overpayment. The third predicts "an inclination to settle an LTD claim." (Source 1.)

Brown & Brown states that the AI "learns about a claim over time, and, as details evolve, the prediction constantly updates to reflect the current realities of the claim," and reports 95 percent accuracy at predicting SSDI award outcomes. This is a continuously updating AI model running on live claimant data — data gathered through Brown & Brown's role as the claimant's SSA-appointed representative, subject to the fiduciary duty of 20 C.F.R. § 404.1740. SSA does not know Claim Compass exists. Plaintiff was not told Claim Compass would be run on his file. Lincoln's mandatory packet did not disclose it. (Source 1.)

1-B.  SettlementConnect — Industry-Wide Settlement Timing Trained on Claimant Data

Lincoln does not have contractual authority to settle LTD benefit obligations outside of litigation. SettlementConnect exists because Lincoln and the LTD industry anticipated that a significant portion of denied claimants would file ERISA lawsuits and built AI infrastructure to optimize settlement timing within those lawsuits. Brown & Brown describes the SSDI award, overpayment recovery, and claim settlement as "critical transitions" in a connected sequence. That sequence begins when Lincoln mandates the SSDI application and ends when Brown & Brown's AI identifies the moment to offer the anticipated ERISA claimant a settlement. (Source 2.)

SettlementConnect does not run on Plaintiff's file alone. Brown & Brown has processed over 200,000 SSDI awards across 18 of the top 20 LTD carriers by premium volume. (Source 4.) That means the settlement inclination model was trained on — and continues to learn from — claimant data from across the LTD industry, including data gathered through Brown & Brown's representative relationships with other claimants in other cases with other carriers. Plaintiff's file, as one of those cases with Brown & Brown as SSA-appointed representative, is simultaneously a data source for the model and a subject of its predictions. The same data Brown & Brown gathers while acting as Plaintiff's fiduciary before SSA feeds an industry-wide AI system whose output is provided to Lincoln to optimize collection and litigation decisions in this case and across its entire book of business.

Brown & Brown's Recovery Services page describes SettlementConnect as "a first-in-its-class service for bridging the critical transitions between the SSDI award, overpayment recovery, and claim settlement," combining data analytics and predictive modeling to "identify the best settlement opportunities for our customers, as well as the ability to pursue them at precisely the right time." "Customers" are LTD carriers. "Precisely the right time" is what the settlement inclination model in Claim Compass predicts. (Source 2.)

1-C.  Advocacy360 — Post-Award LTD Termination Strategy Using SSA-Gathered Data

Advocacy360, described on Brown & Brown's SSDI Advocacy Services page, combines SSDI advocacy experience with LTD claim management expertise to provide "Post-adjudication claim reassessments supports future claim strategy." After SSA has adjudicated the disability claim and issued an award — argued for by Brown & Brown as the claimant's SSA-appointed fiduciary — the same organization advises the carrier on whether the LTD claim can be terminated. The data used to support the SSA award is the same data used to advise on LTD termination. The same organization. One sworn fiduciary certification. Two opposite purposes. (Source 1.)

1-D.  The SSDI Carrier Portal — Overpayment Collection as a Standard System Function

Brown & Brown operates a dedicated SSDI Carrier Portal at portal.bbabsence.com through which carriers submit SSDI referrals, access claim information, and submit overpayment calculations. (Source 3.) Brown & Brown describes Overpayment Reimbursement Facilitation as "a standard part of our SSDI Advocacy Services," stating that Brown & Brown educates claimants "at specific points along the SSDI application journey" so that "every individual is fully aware of their obligation to reimburse their insurance carrier." (Source 2.) This conditioning begins at the first contact in the fiduciary relationship. The claimant

who receives Brown & Brown's services is being prepared from the first meeting to accept repayment obligations to the carrier that funded their representation.

1-E.  Lincoln's "Do Not Spend" Instruction

Lincoln's February 2, 2026 letter states verbatim: "Please do not spend the retroactive benefits as they are due back to Lincoln Financial." (Exhibit R.) Lincoln has no legal authority to restrict how a Social Security beneficiary uses a federally protected award. Brown & Brown's advance notice of award timing through its representative relationship allows the EFT debit to be positioned to capture the funds before they can be applied to living expenses. The "do not spend" instruction and the EFT authorization form are the collection mechanism. The fiduciary relationship is what makes the timing information available.

SECTION 2 — THE STRUCTURAL CONFLICT

Under 20 C.F.R. § 404.1740(a)(1), all persons acting on behalf of a claimant before SSA must "faithfully execute their duties as agents and fiduciaries of a party." The SSA-1696 form Brown & Brown executed in Plaintiff's case on January 9, 2026 certifies under penalty of perjury that Brown & Brown will act solely in Plaintiff's interest before SSA. That certification was executed on the same day and in the same mandatory DocuSign packet as the EFT authorization directing Brown & Brown to collect any resulting award and forward it to Lincoln.

The conflict is not a matter of dual loyalties. It is a matter of designed product function. Brown & Brown built Claim Compass — which predicts settlement inclination in the anticipated ERISA lawsuit — using data gathered through the fiduciary relationship that SSA requires Brown & Brown to maintain with the claimant. The data gathered to fulfill the fiduciary duty is the input to a tool designed to serve the carrier's litigation interests. SSA's representative framework does not contemplate that a fiduciary's data-gathering function would be simultaneously feeding a carrier-facing AI system. The 2018 amendments to 20 C.F.R. § 404.1740(b)(6) added an affirmative duty to disclose to SSA if the representative discovers its services were used to commit fraud against the agency. Brown & Brown has not disclosed Claim Compass's existence to SSA, disclosed its settlement inclination model to SSA, or disclosed that its SSDI advocacy services feed a carrier-facing litigation optimization tool.

This pattern recurs across four cases in this exhibit. Johnson, Lee, and Bunch each contain Lincoln's own boilerplate acknowledging it "obtained and considered independent medical reviews that were not considered by the Social Security Administration in its determination process" (Lincoln/R. Johnson 0301, 0077; Lincoln/Lee 0137; Lincoln/Bunch 0086) — reviews never disclosed to SSA. Bruff is the fourth: Lincoln promised in writing to route Plaintiff's complete claims file to Brown & Brown for SSA submission (Lincoln/Bruff 0715), then refused to produce it to either Plaintiff or Brown & Brown, who confirmed receiving only medical records (Lincoln/Bruff 0354–0360; Exhibit K). In each case, Lincoln controls what SSA sees about its own disability determination while funding or directing the claimant's SSA representation.

SECTION 3 — CROSS-CASE PATTERN TABLE (12 CASES, 7 CIRCUITS)

The collect-and-deny pattern below is the context in which Brown & Brown's AI infrastructure operates. In each case, Lincoln directed a claimant into SSDI advocacy, secured a contractual first lien, and then denied or terminated LTD benefits. The AI tools documented in Section 1 run throughout this sequence in Bruff. Data is drawn from PACER docket records and administrative records filed in federal court.

Confirmed collections: Johnson $8,158.71; Mullins $70,576.39; Wofford $67,344.00; Olson $45,000.00; Lee $9,221.52; Bunch $47,668.16; Berg $28,852.85. Total confirmed: $276,821.63.

| Case | Court | SSDI Directed by Lincoln | Vendor | Reimbursement Agreement | Award / Collection | Key Finding |
|---|---|---|---|---|---|---|
| **Johnson v. Lincoln Life W.D. Ky. 3:22-cv-00626** | 6th Cir. | YES — DCK referral; mandate at initial interview Aug. 2, 2017 | **DCK** | YES (Lincoln/R. Johnson 1114) | **$8,158.71 collected from $36,463 retroactive award (Dec. 10, 2018)** | Overpayment recovered Dec. 10 (Lincoln/R. Johnson 1114); peer review non-disability finding Dec. 7 (Lincoln/R. Johnson 1102–1105); claim closed Dec. 12. Denial boilerplate (identical language recurs in the initial denial and the appeal decision): "not considered by the Social Security Administration" (Lincoln/R. Johnson 0301, Mar. 12, 2020 initial denial; same language repeated at Lincoln/R. Johnson 0077, May 10, 2021 appeal decision). Violates 29 C.F.R. § 2560.503-1(j)(5)(ii). SSDI mandate: initial interview Aug. 2, 2017 (Lincoln/R. Johnson 0067). DCK referral: Lincoln/R. Johnson 0064, 0066. |
| **Mullins v. Consol Energy W.D. Pa. 2:20-cv-1883 3d Cir. 22-2930** | 3d Cir. | YES — plan provision required application | Authorized rep (identity unconfirmed; AR substantially sealed) | CONFIRMED | **$70,576.39 demanded (AR706). Incl. $37,323.97 children's derivative benefits.** | Lincoln's peer reviewer Dr. Patel opined Mullins "would be able to safely and consistently perform full-time (8 hours per day, 5 days per week) work activities from the Date of Disability of 6/12/15 through the present date" (AR816; full report at AR807–19) — i.e., never disabled — from the same onset date SSA paid retroactive benefits (AR706: $70,576.39 demanded). $241,746 attorney fee award, Mullins v. Consol Energy, Inc. Long Term Disability Plan, No. 2:20-cv-01883 (W.D. Pa. Mar. 5, 2025) (post-remand fee order). Third Circuit: "error piled on error." Denial: reviews "not considered by the Social Security Administration." Violates 29 C.F.R. § 2560.503-1(j)(5)(ii). Boilerplate at AR622–27. |
| **Wofford v. Lincoln Life E.D. La. 2:23-cv-02110** | 5th Cir. | YES — IBI referral (Lincoln/Wofford 0655–0657) | IBI | YES (two agreements; Lincoln/Wofford 0953–0954; 0694) | **$67,344.00 demanded. Referred to JMC Collection Agency; later federal Counterclaim.** | $67,344 referred to JMC commercial collection agency (Lincoln/Wofford 0694) and later via federal Counterclaim (ECF No. 9). IBI SSDI referral: Lincoln/Wofford 0655–0657. Reimbursement agreements: Lincoln/Wofford 0953–0954. Denial speculated SSDI "may have been awarded due to... approaching retirement age" (Lincoln/Wofford 0200–0204) without reviewing SSA file. |
| **Olson v. Lincoln Life (Oleson) W.D. La. 2:21-cv-03980** | 5th Cir. | YES — policy provision | Unknown (AR sealed) | CONFIRMED (settlement Apr. 29, 2020) | **$58,491 demanded. $45,000 paid from SSDI retroactive award. Counterclaim for $13,491.** | Lincoln stated "no medical evidence to support his claim of total disability" (ECF No. 1, ¶ 22; Answer and Counterclaim, ECF No. 8) while demanding $58,491 from claimant's SSDI retroactive award. Settlement Apr. 29, 2020; $45,000 paid from SSA proceeds. |
| **Lee v. Lincoln Life W.D. Ark. 5:22-cv-05075 (Walmart plan)** | 8th Cir. | YES — policy provision (Lincoln/Lee 0064) | Unknown (SSRA required; vendor unconfirmed) | CONFIRMED per policy | **$9,221.52 demanded. $6,822.81 collected. $2,398.71 referred to collection agency (Aug. 25, 2021)** | Boilerplate identical to Johnson and Mullins (Lincoln/Lee 0137). $6,822.81 collected via benefit withholding; $2,398.71 referred to collection agency Aug. 25, 2021. Full AR: ECF 12 (1,796 pp.). SSRA: Lincoln/Lee 0064. Violates 29 C.F.R. § 2560.503-1(j)(5)(ii). |
| **Harris v. Lincoln Life N.D. Ga. 1:19-cv-04257 11th Cir. 21-13186** | 11th Cir. | YES — DCK referral Nov. 17, 2017 (Claim Note 103) | **DCK (Doherty and Associates) — same entity as Johnson/Marcus** | YES (SSRA signed before SIU; Claim Note 72) | SSDI denied by ALJ. No retroactive award. Lincoln asserted offset as affirmative defense. | SIU opened July 17, 2017 (Claim Note 77) — no fraud predicate. Physical surveillance: 5.7 hours, 59 seconds of footage, "NO ACTIVITY OBSERVED." DCK simultaneously representing disability to SSA. No OIG |

| Case | Court | SSDI Directed by Lincoln | Vendor | Reimbursement Agreement | Award / Collection | Key Finding |
|---|---|---|---|---|---|---|
| | | | | | | disclosure. Confirmed SIU-concurrent-with-SSDI instance. |
| **Marcus v. Lincoln D. Ariz. 2:24-cv-00228-ROS** | 9th Cir. | YES — DCK referral Mar. 27, 2020 (Claim Note 53, Bates 0056) | **DCK (Doherty, Cella, Keane) — same entity as Harris/ Johnson/White** | YES (standard Lincoln SSRA) | **LTD terminated Aug. 12, 2021 before ALJ decision. DCK still representing disability to SSA.** | SIU triggered solely by Facebook URL (Claim Note 95, Bates 0056). 8 days surveillance; 57 seconds of footage. Adjuster characterized footage to peer reviewer as "snorkl[ing], swim with sharks, steer a sailboat" (Bates 2655–2727: standing waist-deep). Favorable internal review discarded (Dr. Dirlam, 2020, Bates 3076). |
| **White v. Lincoln Life M.D. La. 3:21-cv-00634** | 5th Cir. | YES — Encourage to Apply letter Jul. 30, 2018 (Lincoln/White 1096–1097) | **DCK (Doherty, Cella, Keane) (Lincoln/White 1093)** | YES (Lincoln/White 1125) | SSDI denied by ALJ (Sep. 24, 2018). Lincoln asserted SSRA offset as Fourth Defense while denying any LTD obligation. | Lincoln argued to SSA (via DCK, Lincoln/White 1093) that White could not work full-time while Lincoln's own peer reviewer, Dr. Hill, found in the appeal decision (Lincoln/White 0097) that she could perform full-time sedentary work. Active medical portal login credentials exposed unredacted at Lincoln/White 0884 (ECF No. 13). Separately, and unrelated to the disability determination, Lincoln also filed Ms. White's unredacted bank routing and account numbers into the same public administrative record via a Direct Deposit Application (Lincoln/White 1025) — financial account credentials with no clinical or vocational relevance, exposed regardless. Encourage to Apply letter: Lincoln/White 1096–1097. |
| **Cuming v. Liberty Life W.D. Tex. 1:18-cv-00320** | 5th Cir. | YES — policy provision (Liberty/Cuming 0030) | Unknown | CONFIRMED per policy (Liberty/Cuming 0030) | SSDI fully favorable (onset Sep. 26, 2014). Liberty asserted SSRA offset as affirmative defense. Amount unconfirmed. | SSA found totally disabled (onset Sep. 26, 2014) on same condition Liberty found non-disabling under any-occupation standard. SSRA confirmed: Liberty/Cuming 0030. Offset amount unconfirmed from available excerpts. |
| **Bunch v. Lincoln Life D. Colo. 1:21-cv-02896 (Charter Comms.)** | 10th Cir. | YES — DCK (Doherty, Cella, Keane & Associates) offered; mandate to file within 45 days or benefit reduced (Lincoln/Bunch 0598; ECF 14-3, p. 630) | **DCK offered; claimant used own counsel for SSDI (Shakeshaft-Gorman)** | YES (SS Reimbursement Agreement; Lincoln/Bunch 0620–0621; ECF 14-3, pp. 652–653) | **$47,668.16 demanded (Nov. 21, 2020). SSA approved total disability April 2020. LTD terminated Nov. 16, 2020 — 7 MONTHS after SSA finding.** | SSA total disability April 2020 (Lincoln/Bunch 0058). LTD terminated Nov. 16, 2020 (Lincoln/Bunch 0228) — 7 months later. Overpayment demand $47,668.16 issued November 21, 2020 — five days after the termination letter (Lincoln/Bunch 0086; ECF 14-2, p. 6). Denial boilerplate: "we fully considered the totality of all medical documentation received. We also obtained and considered independent medical reviews that were not considered by the Social Security Administration in its determination process" (Lincoln/Bunch 0086) — the same disclosure-avoidance language documented at Johnson (Lincoln/R. Johnson 0301, 0077) and Lee (Lincoln/Lee 0137), now confirmed in a third case. |
| **Berg v. Lincoln Life E.D. Wash. (Walmart plan) (9th Cir.)** | 9th Cir. | YES — Lincoln's vendor notified Lincoln of SSA award July 25, 2023 (AR 6, AR 250–255; Claim Note 101) | Lincoln's unnamed SSA tracking vendor (SSDI vendor identity not confirmed as DCK) | YES (Social Security Reimbursement Agreement; referenced in ECF 8, Page 6, ¶ 19) | **$28,852.85 demanded and recovered in full (Aug. 23, 2023; AR 5). SSA issued fully favorable decision July 5, 2023. Lincoln terminated LTD July** | SSA fully favorable July 5, 2023 (AR 152–161). LTD termination letter July 14, 2023 (AR 270–276) — 9 days later. Overpayment demanded July 27, 2023 (AR 236–237; $28,852.85); paid in full Aug. 23, 2023 (AR 5). Final denial quoted wrong policy (Liberty vs. Lincoln), omitting "with reasonable continuity" (AR 67–81). Chief Judge Bastian (ECF No. 41): |

| Case | Court | SSDI Directed by Lincoln | Vendor | Reimbursement Agreement | Award / Collection | Key Finding |
|---|---|---|---|---|---|---|
| | | | | | **14, 2023 — 9 DAYS after SSA finding.** | "Decision to deny Plaintiff benefits was arbitrary and capricious." |
| **Bruff v. USAA/Lincoln W.D. Tex. 5:26-cv-01720 5th Cir. 26-50345 [THIS CASE]** | 5th Cir. | **YES — Dec. 23, 2025 and Feb. 2, 2026 letters (Exhibits G, R). Threatened benefit reduction for non-compliance.** | **Brown & Brown Absence Services Group. Lincoln pays B&B fee upon SSDI award.** | **YES — EFT form: "pre-authorization to conduct EFT to repay a debt to a third party." Lincoln/Bruff 0407–0408.** | SSDI reinstatement pending as of filing. Lincoln secured first-lien agreement before award issued. | Lincoln assessed Plaintiff "not a good SSDI candidate" Sep. 17, 2025 (Exhibit SS1). Reversed without clinical explanation 84 days later. Two SIU referrals concurrent with B&B's SSDI advocacy (Aug. 2025; Mar. 20, 2026 — 4 days post-lawsuit). Claim Compass and SettlementConnect running on file. AR pages 0001–0052 absent from certified production. Third-party PHI at Lincoln/Bruff 2021 394–401. No OIG disclosure. Lincoln promised in writing to route Plaintiff's complete claims file to Brown & Brown for SSA submission (Lincoln/Bruff 0715), then refused to produce it to Plaintiff or Brown & Brown despite a signed release authorization (Exhibit I, Jan. 12, 2026); Brown & Brown confirmed receiving only medical records, not the full file (Lincoln/Bruff 0354–0360; Exhibit K, ECF No. 12-15). |
| **TOTALS** | 7 circuits | 12/12 | DCK ×4 circuits; IBI ×1; B&B ×1 (Bruff) | 12/12 | $276,821.63 confirmed collected across 7 cases | Zero OIG disclosures. Zero SSA notifications. No Lincoln-to-SSA/OIG communication found in any administrative record reviewed. |

SECTION 4 — APPELLATE CONTEXT — RELEVANCE TO THIS APPEAL

*The Glenn Structural Conflict Was Before the District Court*. Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), requires courts to weigh a plan administrator's structural conflict of interest as a factor in review. Plaintiff raised Glenn's structural conflict analysis in the district court, applied to the irreconcilability of Lincoln's simultaneous roles: directing Plaintiff's SSDI application through Brown & Brown while holding a contractual first lien on the resulting federal award, and then denying or preparing to deny the LTD claim on the basis of the disability Lincoln was simultaneously asserting to SSA. The district court's text-order pattern did not engage Glenn or the structural conflict. Lincoln's Motion to Dismiss (ECF No. 35) was filed after the interlocutory appeal was pending, was never fully briefed, and was not ruled upon by the district court.

*The AI Tools Were Not Before the District Court.* The Brown & Brown AI infrastructure documented in Sections 1 and 2 of this exhibit was not disclosed to the district court by Lincoln and was not known to Plaintiff at the time of the district court proceedings. Plaintiff discovered the pattern of strategically timed LTD denials following SSDI awards through PACER research conducted after the Fifth Circuit granted a fee exemption. That research revealed the collect-and-deny sequence across twelve cases in seven circuits. The investigation of what Brown & Brown actually does — and the discovery of Claim Compass, SettlementConnect, and Advocacy360 — followed from that cross-case research and was completed in July 2026. The district court had no opportunity to engage what it was not shown.

*The AI Findings Take the Glenn Conflict to Its Logical Extreme*. Plaintiff raises the Brown & Brown AI tools not to present a freestanding new claim, but so that the Fifth Circuit may take notice of the full architecture of the structural conflict Glenn requires courts to weigh. Glenn identifies the structural problem at the level of the plan administrator evaluating and paying the same claim. The Brown & Brown infrastructure takes that conflict to its institutional conclusion: the same organization that certifies to SSA as Plaintiff's fiduciary simultaneously operates a continuously updating AI model predicting Plaintiff's settlement inclination in this litigation, trained on data from over 200,000 claimant files gathered through the same fiduciary relationship across 18 carriers. The conflict Glenn identified at the structural level is, in the Brown & Brown context, a designed product function — documented in the vendor's own carrier-facing marketing materials and active in this case.

If the Fifth Circuit does not reverse, the Glenn structural conflict the district court declined to engage will remain unaddressed in a case where the conflict is not merely structural but operational: the same entity representing Plaintiff before SSA is running an AI model on his file to advise Lincoln on when to settle the ERISA lawsuit that the district court's non-engagement has allowed to proceed without resolution.

SECTION 5 — INSTITUTIONAL NOTICE — THE COST OF COMPLIANCE VERSUS THE COST OF SETTLEMENT

The DOL's December 2023 Advisory Council Report found that long-term disability claims account for 64.5 percent of all ERISA benefits litigation. The pattern documented in this exhibit — twelve cases, seven federal circuits, one insurer — is consistent with what the DOL identified: a category of ERISA fiduciary where wrongful denial and litigation may be priced as a manageable cost rather than a compliance failure.

Brown & Brown's SettlementConnect product identifies, in its own carrier-facing description, "precisely the right time" to offer settlement to claimants who have filed ERISA litigation. (Source 2.) That product was built by a vendor shared across 18 of the top 20 LTD carriers. Its training data is drawn from over 200,000 claimant files gathered through Brown & Brown's SSA-appointed representative relationships.

(Source 4.) The federal courts whose dockets carry ERISA LTD cases are a known and anticipated stage in the operational sequence Brown & Brown describes as "critical transitions" between SSDI award, overpayment recovery, and claim settlement.

In Bruff, Lincoln denied Plaintiff vocational rehabilitation services and refused to issue a denial letter, implicating ERISA § 503 and 29 C.F.R. § 2560.503-1. Lincoln applied a 24-month mental illness limitation to a claimant with documented physical comorbidities, with no clinical explanation for the classification. Both issues were identified in Plaintiff's filings. The district court's text-order pattern did not engage either of them. Lincoln required Plaintiff to apply for SSDI while simultaneously operating active SIU referrals and not notifying SSA-OIG.

The Fifth Circuit is asked to take institutional notice of the structural question this raises: whether Lincoln maintains institutional policies to comply with ERISA's procedural requirements, or whether the litigation-and-settle model that Brown & Brown's AI infrastructure optimizes has displaced those policies. That question goes to potential bad faith and to the integrity of proceedings before this Court and the district courts of this circuit. It has never been subjected to discovery. Discovery in the district court will reveal whether Lincoln's claims decisions in Bruff were made with awareness of SettlementConnect's predictions and Claim Compass's assessments. The Fifth Circuit can preserve that question for remand.

## SOURCES — BROWN & BROWN PUBLIC DOCUMENTS

All web sources below were active and publicly accessible as of July 2026 and have been archived via the Wayback Machine; the archived URL is provided immediately after each live URL below. All product descriptions quoted in Sections 1–2 are drawn verbatim from the pages cited below.

1. SSDI Advocacy Services Page — Claim Compass and Advocacy360

   Brown & Brown Absence Services Group, SSDI Advocacy Services (containing Claim Compass product description, three AI model descriptions, 95% accuracy figure, Advocacy360 feature list, and carrier-facing marketing language "your blocks of business"):

   *https://www.bbabsence.com/ssdi-advocacy-services/*

   Archived July 20, 2026: https://web.archive.org/web/20260720084354/https://www.bbabsence.com/ssdi-advocacy-services/

2. Recovery Services Page — SettlementConnect and Overpayment Reimbursement Facilitation

   Brown & Brown Absence Services Group, Recovery Services (containing SettlementConnect "first-in-its-class" description, "precisely the right time" language, BIMS Signature Solution description, and Overpayment Reimbursement Facilitation "standard part of our SSDI Advocacy Services" language):

   *https://www.bbabsence.com/recovery-services/*

   Archived July 20, 2026: https://web.archive.org/web/20260720084353/https://www.bbabsence.com/recovery-services/

3. SSDI Carrier Portal

   Brown & Brown Absence Services Group, SSDI Carrier Portal (carrier-restricted portal for SSDI referral submission, claim information access, and overpayment calculation submission; login page states "restricted to authorized individuals and subject to monitoring"):

   *https://portal.bbabsence.com/*

   Archived July 20, 2026: https://web.archive.org/web/20260720091116/https://portal.bbabsence.com/ . Portal functionality described in Brown & Brown's Consultant User Guide (see Source 6 below).

4. Brown & Brown Press Release — Rebranding and 200,000 Awards Figure

Brown & Brown / PRWeb press release announcing rebranding of The Advocator Group and Professional Disability Associates to Brown & Brown Absence Services Group (combined 200,000 SSDI awards; 18 of top 20 LTD carriers by premium volume; source of figures Lincoln included in mandatory DocuSign packet):

*https://www.prweb.com/releases/the-advocator-group-and-professional-disability-associates-announce-rebranding-change-name-to-brown-amp-brown-absence-services-group-829528230.html*

Published February 15, 2021. Archived July 20, 2026: https://web.archive.org/web/20260720091450/https://www.prweb.com/releases/the-advocator-group-and-professional-disability-associates-announce-rebranding-change-name-to-brown-amp-brown-absence-services-group-829528230.html

Figures quoted in Brown & Brown CEO letter (Exhibit Brown1), which Lincoln assembled and delivered to Plaintiff on January 9, 2026 as part of mandatory DocuSign enrollment packet.

5. Brown & Brown Press Release — Acquisition of Social Security Advocates for the Disabled (SSAD)

Brown & Brown, Inc. investor press release announcing acquisition of SSAD (founded 1994; approximately $10 million annual revenues as of 2015; reports to The Advocator Group):

*https://investor.bbrown.com/news-releases/news-release-details/brown-brown-inc-announces-acquisition-social-security-advocates/*

Published February 8, 2016. Archived July 20, 2026: https://web.archive.org/web/20260720084723/https://investor.bbrown.com/news-releases/news-release-details/brown-brown-inc-announces-acquisition-social-security-advocates/

6. BBA Connects Consultant User Guide

Brown & Brown Absence Services Group, BBA Connects Consultant User Guide (Salesforce-powered centralized case management system; standardized case types across all carrier relationships; includes portal tutorial describing SSDI referral submission and overpayment calculation functions):

*https://www.bbabsence.com/wp-content/uploads/2023/04/BBA-Connects-Consultant-User-Guide.pdf*

Archived July 20, 2026: https://web.archive.org/web/20260720092556/https://www.bbabsence.com/wp-content/uploads/2023/04/BBA-Connects-Consultant-User-Guide.pdf

7. Brown & Brown Absence Services Group Blog — First-Year Retrospective

Brown & Brown Absence Services Group blog post documenting 9,000+ additional SSDI awards secured in first year following February 2021 rebranding:

*https://www.bbabsence.com/blog/a-look-back-at-our-first-year-as-brown-brown-absence/*

Published December 20, 2021. Archived March 25, 2025: https://web.archive.org/web/20250325013839/https://www.bbabsence.com/blog/a-look-back-at-our-first-year-as-brown-brown-absence/

Cross-References to Filed Exhibits:

Exhibit Brown1 — Brown & Brown mandatory DocuSign packet (January 9, 2026): CEO letter (200,000 awards; 18 of top 20 LTD carriers); SSA-1696 with Section 6 third-party payment certification; EFT authorization form ("debt to a third party").

Exhibit R — Lincoln February 2, 2026 letter: "Please do not spend the retroactive benefits as they are due back to Lincoln Financial."

Exhibit SS1 — Lincoln September 17, 2025 letter: Plaintiff assessed "not a good SSDI candidate"; reversed 84 days later without clinical explanation.

Exhibit G — Lincoln December 23, 2025 first SSDI demand letter; introduction of Brown & Brown.

Charles Terrence Bruff
Plaintiff-Appellant, Pro Se
Bruff v. USAA et al., No. 26-50345 (5th Cir.)
